## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA



Filed/Docketed
Apr 13, 2021

| | |
|---|---|
| IN RE:<br><br>JEFFREY LYN MORROW,<br><br>        Debtor. | Case No. 18-12437-M<br>Chapter 7 |
| IN RE:<br><br>MICHELLE RENEE MORROW,<br><br>        Debtor. | Case No. 18-12447-M<br>Chapter 7 |
| C & L SUPPLY, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>JEFFREY LYN MORROW,<br><br>        Defendant. | Adversary No. 19-01007-M<br>(consolidated with 19-01008-M) |
| C & L SUPPLY, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>MICHELLE RENEE MORROW,<br><br>        Defendant. | Adversary No. 19-01008-M |

## MEMORANDUM OPINION

## Introduction

In our society, love is often allowed to be blind.  People to whom money is owed are rarely granted such a luxury.  The questions before the Court in this adversary proceeding are whether a creditor reasonably relied upon boilerplate language contained in the depths of two guaranties prepared by the creditor, and whether debtors, who admittedly obtained funds to which the creditor was entitled, may assuage the situation by providing the creditor with an alternate source of funds and paying that creditor far more from the alternate source than was wrongfully taken.  The Court answers each question in favor of the debtors.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Procedural Background

Presently at issue before the Court is whether certain debts owed by a small business are excepted from the discharge of its guarantors pursuant to 11 U.S.C. § 523(a)(2)(B), (a)(4), and (a)(6).[1]  A trial was held by video conference on March 17, 2021, at which the Court heard argument and received evidence.  The Court also considered the statement of admitted facts contained in the PreTrial Order, filed in this adversary proceeding on October 20, 2020, as well as the undisputed facts found in its prior orders resolving two motions for summary judgment.[2]

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[2] PreTrial Order, at Docket No. 45, at 2–3. The admitted facts are largely based on facts that were deemed established in the Court's Order Denying Summary Judgment, at Docket No. 25, at 20. *See also C&L Supply, Inc. v. Morrow (In re Morrow)*, 613 B.R. 786 (Bankr. N.D. Okla. 2020) (Order Granting Renewed and Supplemental Motion for Summary Judgment in Part and Denying in Part).  The PreTrial Order contains 24 separately numbered stipulations of fact.  The Court includes only those facts necessary to reach its decision herein.

## Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). Reference to the Court of this adversary proceeding is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(I).

## Burden of Proof

Exceptions to discharge are to be narrowly construed in favor of the debtor so as to promote the "fresh start" policy of the Bankruptcy Code.[3]  Under § 523, a creditor seeking to except its claim from discharge must prove the claim is nondischargeable by a preponderance of the evidence.[4]  A creditor has the burden to establish that it holds a valid claim against a bankrupt estate.[5]  The validity of a creditor's claim is determined by state law.[6]  Payment is an affirmative defense to a claim under Oklahoma law.[7]  A party asserting an affirmative defense bears the burden of proving that defense by a preponderance of the evidence.[8]

## Findings of Fact

Tri-City Services, Inc. ("Tri-City") is a commercial plumbing contractor owned by two siblings, Michelle Renee Morrow and Jeffrey Lyn Morrow, (collectively, the "Morrows" or "Defendants").[9]  C&L Supply, Inc. ("C&L") is an Oklahoma corporation in the business of wholesale plumbing supply sales and distribution.  Beginning in at least 2007, Tri-City set up an account with C&L through which C&L sold various plumbing supplies and merchandise to Tri-

---

[3]  *See Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir. 1993).
[4]  *Id.* (*citing Grogan v. Garner,* 498 U.S. 279, 291 (1991)).
[5]  *Grogan v. Garner*, 498 U.S. 279, 283–84 (1991).
[6]  *Id.*
[7]  Okla. Stat. Ann. tit. 12, § 2008(C)(14).
[8]  *State ex rel. Gibson v. 1997 Dodge 350 One Ton Dually Pickup*, 35 P.3d 1009, 1014 (Okla. Civ. App. 2001) ("A party asserting an affirmative defense bears the burden of proving that defense by a preponderance of the evidence.").
[9]  PreTrial Order, at Docket No. 45, ¶ II(1).

City.[10]  Initially, Michelle Morrow, individually, guaranteed Tri-City's account with C&L.[11]  In late 2008, Mark Kidd ("Kidd"), CEO of C&L, became concerned about the large past-due balance of Tri-City's account and assumed responsibility for the account on behalf of C&L.  As of May, 2009, Tri-City was seriously delinquent on its account and owed C&L $406,829.13.[12]

***The Loan***

In his effort to collect amounts due to C&L on the Tri-City account, Kidd began to hold periodic meetings with the Morrows.  He became aware that Tri-City was in dire financial condition and would soon be unable to meet its payroll obligations.  C&L determined to loan Tri-City an additional $25,000 (the "Loan").[13]  The purpose of the Loan was to keep Tri-City in operation, allow it to make payroll, collect its own receivables, and finish jobs through which C&L would hopefully receive significant payments.[14]  As discussed *infra*, the strategy worked.  Kidd testified that a major reason C&L extended the Loan was to secure the personal guaranty of Jeff Morrow for the entire Tri-City debt to C&L. The Loan was documented at a meeting at which a promissory note from Tri-City to C&L was executed by Michelle Morrow, as its President, and guaranty agreements were executed by Michelle Morrow and Jeff Morrow (the "Guaranty Agreements").[15]  Through the Guaranty Agreements, Michelle Morrow and Jeff Morrow guaranteed all indebtedness of Tri-City to C&L.[16]

---

[10]  *Id*. at ¶ II(2).
[11]  *Id*. at ¶ II(3).
[12]  *Id*. at ¶ II(4).
[13]  *Id*. at ¶ II(5).
[14]  *Id*. at ¶ II(6).
[15]  *Id*. at ¶ II(7). *See also* Tr. Ex. 15 (Promissory Note), 6 (Michelle Morrow), & 7 (Jeff Morrow).
[16]  *Id*. at ¶ II(8).

Kidd testified that he had drafted the Guaranty Agreements based on various forms he had encountered in his business. The Guaranty Agreements are each 3 1/2 pages of single-spaced boilerplate guaranty language in small type. They include representations from the Morrows to C&L, to induce C&L to extend additional credit, that (i) the fair saleable value of each Guarantor's assets exceeded their liabilities; (ii) each Guarantor was then meeting current liabilities as they matured; and (iii) no federal or state tax liens had been threatened or filed against each Guarantor.[17] These representations were buried on the second page and not set out from the other text, highlighted, or conspicuous in any way.[18] Kidd testified that C&L relied upon these representations in making the Loan, and would not have made the Loan had they known these representations to be untrue. The Court does not find this testimony credible, and finds that C&L made the Loan in order to enable Tri-City to make payroll, finish jobs, collect receivables, and remit those receivables to C&L. The Court finds that C&L would have made the Loan to Tri-City in any event, Kidd's testimony to the contrary notwithstanding.

The conduct of the parties in executing the Guaranty Agreements supports this conclusion. The Morrows both testified that the Guaranty Agreements were presented to them for the first time at the meeting at which they executed the promissory note, both executed the Guaranty Agreements without reading the specifics, and neither were given a copy to keep for their files. The parties did not discuss the representations contained therein, nor did they discuss the Morrows' personal financial affairs at that meeting, or at any other time. Kidd testified that he requested personal financial statements from each of the Morrows, but never received them.

---

[17]  *Id*. at ¶ II(9).
[18]  Guaranty Agreements, Tr. Ex. 6, at 2 (Michelle Morrow), & 7, at 2 (Jeff Morrow).

*The Checks*

About the same time as the Loan, C&L also began requiring joint check agreements and outright assignments of Tri-City's accounts on Tri-City's larger jobs or projects.[19]  The joint check agreements required Tri-City's customers to include C&L as a joint payee on checks issued to Tri-City.[20]  In one of these arrangements, in September 2009, Tri-City and C&L entered into a joint check agreement (the "Joint Check Agreement") with United Resources Building Co. ("United Resources") for a specific job in Kansas, Oklahoma (the "Kansas Job").[21]  The Joint Check Agreement stated in its entirety:

> C & L Supply, Inc. of Vinita, Oklahoma, will be furnishing plumbing material on the Kansas Public School Addition project located at 275 S. Main, Kansas, OK 74347 through Tri-City Services, Inc. at Sperry, Oklahoma.
>
> C & L Supply, Inc. and Tri-City Services, Inc, request that checks be made jointly payable to C & L Supply, Inc. and Tri-City Services, Inc. for the plumbing material provided for this job.[22]

The parties disagreed on their understanding of the operation of the Joint Check Agreement.  Jeff Morrow testified that, under the Joint Check Agreement, he expected to receive two checks from United Resources, one to cover labor, and a second for materials for the Kansas Job.  It was the second check that was to be paid over to C&L. To the extent only one check was issued, Jeff Morrow understood that the funds would ultimately be divided between Tri-City and C&L for labor and material costs, respectively. Kidd testified that C&L expected to receive all of the funds paid under the Joint Check Agreement to apply to the Tri-City account.

---

[19]  PreTrial Order, at Docket No. 45, at ¶ II(10).
[20]  *Id*. at ¶ II(11).
[21]  *See* Tr. Ex. 3.
[22]  *Id.*

From December 9, 2009, through February 16, 2010, Tri-City received three checks from United Resources for the Kansas Job totaling $33,426.90 (the "Checks").[23]   Each Check listed both Tri-City and C&L as payees.   The Morrows admit that C&L's endorsement was forged on these three Checks, and the fraudulently endorsed Checks were deposited into Tri-City's account, instead of being paid to C&L.[24]   The Morrows do not admit that either of them were directly involved in the fraudulent endorsement of the Checks, although they acknowledge that it occurred while the Checks were under the control of Tri-City.

On April 21, 2010, the parties met, and Michelle Morrow executed an assignment (the "Assignment") of *all* of Tri-City's interest in the Kansas Job from the United Resources account to C&L.[25]   Such funds were to be paid directly to C&L. The parties' testimony differed greatly on the meaning and purpose of the Assignment.   Kidd did not recall whether he knew about the fraudulently endorsed Checks at the time the Assignment was negotiated.   He testified that the Assignment was simply an additional effort to collect amounts owed on the Tri-City account, and that its execution was unrelated to the Checks.   Both Michelle Morrow and Jeff Morrow testified that all parties were aware of the misdirected Checks as of the date of the Assignment, and that the purpose of the Assignment was to compensate C&L for the loss of funds from the Checks.   Jeff Morrow testified that the Assignment was made to "right a wrong" created by the Checks by assigning 100% of the revenue from United Resources on the Kansas Job, including for labor and profit, to C&L.   After April 2010 until the job was completed in roughly August 2010, all funds paid by United Resources on the Kansas Job, which totaled approximately $200,000, were paid directly to C&L.

---

[23]   Tr. Ex. 5.
[24]   PreTrial Order, at Docket No. 45, at ¶ II(12 & 13).
[25]   Tr. Ex. 4.

On the issue of why the Assignment was negotiated, the Court finds the testimony of the Morrows to be more credible. Kidd was unable to explain why such an assignment was necessary, given his interpretation of the Joint Check Agreement, unless he was aware that the Checks issued under that agreement had been incorrectly deposited by Tri-City. Nor could he explain why the Morrows might suddenly change course and turn over all funds due them from United Resources on the Kansas Job to C&L, including for labor and profit, for no apparent additional consideration. The Court finds as a matter of fact that Kidd knew about the Checks, and that the Assignment was the result of a negotiated settlement between C&L and the Morrows to compensate C&L for the funds that had been misdirected to Tri-City as a result of the fraudulently endorsed Checks. The Court finds that the purpose of the Assignment was to make C&L whole from any damages it may have suffered from the failure of Tri-City to turn over the Checks.

As of September 24, 2009, the date of the final signature on the Joint Check Agreement, Tri-City owed C&L a balance of $417,610.23.[26] As of April 21, 2010, the date the Assignment was executed, Tri-City's debt to C&L stood at $280,916.92.[27] Thus, despite the failure of Tri-City to turn over the Checks to C&L, and despite additional goods being credited to the Tri-City account for its various ongoing jobs, C&L received $136,693.31 during this period to apply to the Tri-City account. By the end of August, which is roughly when the Kansas Job was to be completed, Tri-City had paid down its account balance by another $57,091.61, leaving its balance owed to C&L at $223,825.31.[28] Therefore, between the date of the execution of the Joint Checking Agreement

---

[26] *See* Tr. Ex. 102, at 9 (entry dated 9/24/09).
[27] *Id*. at 16 (entry dated 4/20/10).
[28] *Id*. at 21 (entry dated 8/30/10).

and the completion of the Kansas Job, Tri-city reduced its debt to C&L by approximately $193,784.

Kidd testified that he applied the revenue from the Assignment to the Tri-City account based on rules in a credit application (the "Credit Application") submitted in 2007.[29]  The Credit Application provides for how payments to C&L would be applied and interest on past due amounts would be calculated.  Under its terms, "[a]ll payments received by C&L from Applicant shall be applied first to the payment in full of any accrued service charges then due and payable, and next to the payment of the oldest portion of the Applicant's past due account balance, determined according to the shipment date(s) of *merchandise* for which payment has not been received."[30]  The Court finds that the Credit Agreement deals specifically with "merchandise purchased" by Tri-City from C&L, and has no application to the amounts collected by C&L under the Assignment.

***The Bankruptcy Cases***

On December 6, 2010, Michelle Morrow and Jeff Morrow each filed petitions for relief under Chapter 7 of the United States Bankruptcy Code (the "2010 Bankruptcy Cases").[31]  Both Michelle Morrow and Jeff Morrow failed to list C&L as a creditor in the 2010 Bankruptcy Cases and C&L was not listed or included on any mailings or notices of the bankruptcy filings.[32]  As a result, the debt to C&L was not covered by the Morrows' discharges entered pursuant to § 727 in the 2010 Bankruptcy Cases.[33]  After the 2010 Bankruptcy Cases, C&L continued to do business

---

[29] Tr. Ex. 119.

[30] Tr. Ex. 19-2 (emphasis added).

[31] PreTrial Order, at Docket No. 45, at ¶ II(14).

[32] *Id.* at ¶ II(15).

[33] *See C&L Supply, Inc. v. Morrow (In re Morrow)*, 613 B.R. 786, 794-97 (Bankr. N.D. Okla. 2020) (Order Granting Renewed and Supplemental Motion for Summary Judgment in Part and Denying in Part).

with Tri-City and extend credit to Tri-City.  In early 2014, C&L filed suit against the Morrows and Tri-City in the District Court of Craig County, Oklahoma (the "State Court") on the account (the "State Court Action").   The State Court had the authority to make a determination of dischargeability of C&L's debt pursuant to § 523(a)(3) in the State Court Action.[34]  As a result of the judgment in the State Court Action, the Morrows' entire debt to C&L was excepted from discharge in the 2010 Bankruptcy Cases.[35]  Thereafter, C&L proceeded with execution on its judgment, including garnishments and asset hearings.[36]  On December 13, 2018, Jeff Morrow filed a second petition for relief under Chapter 7 of the United States Bankruptcy Code.[37]  On December 17, 2018, Michelle Morrow filed a second petition for relief under Chapter 7 of the United States Bankruptcy Code.[38]

On February 15, 2019, C&L filed separate adversary proceedings against the Morrows. These adversary proceedings were procedurally consolidated by the Court.  C&L now seeks a determination that the following debts are non-dischargeable: 1) the sum of $59,264.38 on the Morrows' Guaranty Agreements of the $25,000 Loan, pursuant to § 523(a)(2)(B); and 2) the sum of $118,573.21 on the forged endorsement of C&L on the three Checks, pursuant to § 523(a)(4) and/or (a)(6).[39]

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

---

[34] *Id*. at 797-99.
[35] *Id*. at 799-803.
[36] PreTrial Order, at Docket No. 45, at ¶ II(20).
[37] *Id*. at ¶ II(21).
[38] *Id*. at ¶ II(22).
[39] *Id*. at ¶ II(24).

**Conclusions of Law**

*§ 523(a)(2)(B)*

C&L seeks a determination that the obligations of the Morrows under the Guaranty Agreements are excepted from discharge under § 523(a)(2)(B).[40]  That section excepts from discharge any debt

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
>> (B) use of a statement in writing–
>>
>>> (i) that is materially false;
>>>
>>> (ii) respecting the debtor's or an insider's financial condition;
>>>
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>
>>> (iv) that the debtor caused to be made or published with intent to deceive[.][41]

C&L contends that the representations made in the Guaranty Agreements were false in that they materially misrepresented the financial solvency of each of the Morrows.  The Court finds, for the reasons set forth below, that C&L did not reasonably rely on the statements regarding the Morrow's financial condition when it decided to extend the Loan.  Accordingly, the debt owed by the Morrows to C&L related to the Loan is dischargeable, and the Court need not consider any of the other elements under § 523(a)(2)(B).

---

[40]  C&L appeared to be making arguments related to § 523(a)(2)(A) at the trial in this proceeding.  The PreTrial Order, *at Docket No. 45*, indicated that the Court would be asked to determine factual issues under § 523(a)(2)(B), but there was no mention of § 523(a)(2)(A).  In any event, the Court finds that the representations contained in the Guaranty Agreements are "statement[s] respecting the debtor's or an insider's financial condition," such that, by its plain language, § 523(a)(2)(A) would not operate to except the debt based on the Loan from the Morrows' discharges. *See* § 523(a)(2)(A).

[41]  § 523(a)(2)(B).

11

This Court has previously outlined the standards for reasonable reliance under § 523(a)(2)(B):

> This Court adopts the test for reasonable reliance under § 523(a)(2)(B) set forth by the United States Court of Appeals for the Third Circuit in [*Ins. Co. of North America v. Cohn (In re Cohn)*]:

>> The reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances.

>> A determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

> *Cohn,* 54 F.3d at 1117 (citations omitted); *see also Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir. 1993); *First Bank of Colo. Spgs. v. Mullet (In re Mullet),* 817 F.2d 677, 679 (10th Cir. 1987) ("This standard of reasonableness [under § 523(a)(2)(B)] places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations."). The determination of whether a creditor has reasonably relied upon a financial statement is a question of fact to be decided on a case by case basis. *Id.; see also In re Morris,* 223 F.3d 548, 553 (7th Cir. 2000) (citation omitted).[42]

The Court of Appeals for the Tenth Circuit has noted that

> [t]his standard of reasonableness places a measure of responsibility upon a creditor to ensure that there exists some basis for relying upon the debtor's representations.

---

[42] *In re Smith*, 278 B.R. 532, 537–38 (Bankr. N.D. Okla. 2002) (footnote omitted) (quoting *Ins. Co. of North America v. Cohn (In re Cohn),* 54 F.3d 1108, 1113–1114 (3rd Cir. 1995)). *See also In re White*, No. 07-11482-M, 2008 WL 5156967, at *7 (Bankr. N.D. Okla. Sept. 25, 2008).

Of course, the reasonableness of a creditor's reliance will be evaluated according to the particular facts and circumstances present in a given case.[43]

In the present case, C&L extended the Loan for the purpose of keeping Tri-City in operation to allow it to collect its own receivables, make payroll, and finish jobs through which C&L would hopefully receive significant payments.[44]  Kidd saw the Loan as a way to get Jeff Morrow "on the hook" for the entire Tri-City account debt by securing his personal guaranty.  Kidd stated that he cobbled together the Guaranty Agreements from old forms so that they would contain various representations regarding the Morrows' financial status.  He was very concerned with *the fact* that the Morrows were both on record making those representations, but much less concerned about the accuracy of those representations.  The Morrows both testified that they gave the Guaranty Agreements at most a cursory glance before signing them in front of Kidd, which Kidd would have witnessed.[45]  All parties testified that there was no discussion of the Morrows' personal financial condition at any time surrounding the extension of the Loan.  Kidd indicated that he had requested a personal financial statement from both of the Morrows in conjunction with the Loan, but none was ever received.  C&L nonetheless proceeded to extend the Loan to Tri-City.

The Morrows do not dispute that the representations made in the Guaranty Agreements were materially false.  Nor do they make any argument that the Guaranty Agreements are not legally enforceable contracts.  In fact, C&L has collected significant sums from the Morrows over the last decade on account of the Tri-City debt.[46]  The Morrows simply argue that C&L could not

---

[43] *First Bank of Colo. Spgs. v. Mullet (In re Mullet),* 817 F.2d 677, 679 (10th Cir. 1987), *abrogated on other grounds by Field v. Mans*, 516 U.S. 59 (1995) (holding standard of justifiable reliance applies to § 523(a)(2)(A)).

[44] *Id*. at ¶ II(6).

[45] Kidd testified that he could not recall whether or not he observed the Morrows reading the Guaranty Agreements at their meeting regarding the Loan.

[46] Tr. Ex. 102.

have reasonably relied on their representations in the Guaranty Agreements under the circumstances, making any debt thereunder subject to discharge.

The Court looks to the factors discussed in *Cohn* regarding whether a creditor reasonably relied on a debtor's representation regarding their financial condition.[47]   Little evidence was presented as to whether C&L followed its own standard practices regarding the extension of credit. Kidd testified that he regularly required both guaranty agreements and personal financial statements from the principals of C&L's customers.   He testified that he requested updated personal financial statements from the Morrows, but gave no explanation why he made the Loan without such documents.   The Court was provided no evidence regarding the general standards utilized by plumbing supply distributors regarding the extension of credit to customers, rendering it unable to determine whether C&L's conduct could have fallen within such standards.[48]   Lastly, the circumstances surrounding the Loan, at a time when Tri-City was having difficulty meeting its payroll obligations, collecting its own receivables, and owed C&L more than $400,000, should have at least raised a "red flag" regarding the financial condition of Tri-City's principals.   Kidd seemed content to have the Morrows' signatures on the Guaranty Agreements, regardless of the veracity of the representations contained therein.   He made no effort to receive additional information about the Morrows or discuss their personal financial condition.   Given the red flags raised by the dire financial condition of Tri-City, C&L bore a "measure of responsibility" to "ensure that there exist[ed] *some* basis for relying upon" the Morrows' representations.[49]   The

---

[47]   *In re Smith*, 278 B.R. at 537–38 (citing *In re Cohn*, 54 F.3d at 1113–1114); *In re White*, 2008 WL 5156967, at *7.

[48]   *In re Smith*, 278 B.R. at 539 (lack of evidence regarding general standards in banking industry precluded determination regarding whether bank's conduct could have fallen within those standards).

[49]   *See First Bank of Colo. Spgs. v. Mullet (In re Mullet)*, 817 F.2d 677, 679 (10th Cir. 1987), *abrogated on other grounds by Field v. Mans*, 516 U.S. 59 (1995).

Court concludes that C&L did not meet its burden of proof to show that it reasonably relied on the representations made by the Morrows in the Guaranty Agreements when it extended the Loan.

***The Checks***

Pursuant to Section 101(12) of the Bankruptcy Code, a "debt" means a liability on a claim. Pursuant to Section 101(5), a "claim" means—

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[50]

C&L argues that the forgery of C&L's endorsement on the Checks, and their subsequent deposit into Tri-City's business checking account, amounts to embezzlement, larceny, or conversion by the Morrows, making its debt excepted from discharge under § 523(a)(4) or (a)(6).  Regardless of the specific circumstances surrounding the depositing of the Checks into the Tri-City bank account, the Court concludes that C&L has not met its burden to prove that it was damaged as a result of the failure of Tri-City to turn over the Checks.  The Joint Check Agreement directed United Resources to make checks "for the plumbing material provided" for the Kansas Job jointly payable to C&L and Tri-City.  After the three Checks, with a total value of $33,426.90, were mis-directed into Tri-City's bank account, the parties met and negotiated the Assignment.  As noted *supra*, the Court finds that the purpose of the Assignment was to make C&L whole from any damages it may have suffered from the failure of Tri-City to turn over the Checks.

Although the Court does not condone or excuse the actions of Tri-City in failing to turn over the Checks, it does not believe that C&L has carried its burden to show that it holds a claim

---

[50]  § 101(5).

15

against the Morrows related to the Checks.  C&L claims it was damaged in the amount of $33,426.90 by not receiving the Checks.  C&L ultimately received approximately $200,000 from United Resources for the Kansas Job under the Assignment. The evidence shows that after becoming aware that the Checks had not been properly turned over to C&L, the parties came to an agreement whereby C&L would take 100% of the remaining revenue from the Kansas Job paid by United Resources as compensation for any damage C&L may have suffered due to the missing Checks.  As a result, the Assignment effectively gave C&L a lien on Tri-City's account receivable from United Resources related to the Kansas Job.  While C&L was unable to isolate revenues from the Kansas Job in its records, those records show that Tri-City reduced its account balance owed to C&L by more than $57,000 during the completion of the Kansas Job.  The Court finds that the Morrows have met their burden to show that C&L was more than compensated for the loss of the revenue from the Checks as a result of the Assignment.  The Court concludes that upon completion of the Kansas Job, C&L was in fact made whole from any damage it suffered as a result of the Checks, and that the Checks do not serve as the basis for a valid claim against Tri-City or the Morrows.

The Court finds that to the extent C&L still shows a debt from Tri-City on its books related to the Checks, it is the result of "creative accounting," whereby C&L applied the revenue generated from the Assignment (over and above material costs) to Tri-City's oldest debt and fees instead of applying it to offset its damages from the Checks.  C&L defends this accounting procedure by looking to the Credit Application, even though that document clearly limits its application to past due amounts based on "merchandise purchased."[51]  Such a practice was not in the spirit of the deal the parties reached in executing the Assignment.  Nor does the Court find C&L's effort to expand

---

[51]  Tr. Ex. 119.

its purported damages to include interest based on the Credit Agreement to have any legal basis. Under C&L's analysis, the Morrows could never make amends for the taking of the Checks until C&L was paid in full, and the assignment of over $200,000 in receivables from the Kansas Job is rendered meaningless, at least in the eyes of the Morrows.

### Conclusion

C&L has not met its burden to show that it reasonably relied on the representations made by the Morrows in the Guaranty Agreements when it extended the Loan, as required to prevail under § 523(a)(2)(B).  The Court also concludes that, although C&L suffered conversion of property related to the Checks, the Morrows have met their burden to show that any resulting debt has been repaid.  Any remaining debt of the Morrows to C&L is dischargeable, and judgment should be entered in favor of the Morrows on all claims brought against them.

Separate judgments consistent with this Memorandum Opinion shall be entered concurrently herewith.

Dated this 13th day of April, 2021.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE